**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

J.J. DELUCA COMPANY, INC.,           :
                                     :   CIVIL ACTION NO. 04-4344 (MLC)
        Plaintiff,                   :
                                     :   **MEMORANDUM OPINION**
        v.                           :
                                     :
UNITED STATES DEPARTMENT OF          :
HOUSING & URBAN DEVELOPMENT,         :
et al.,                              :
                                     :
        Defendants.                  :
_____:

**COOPER, District Judge**

Plaintiff, J.J. DeLuca Company, Inc. ("DeLuca"), commenced this action on July 26, 2004 in New Jersey Superior Court against the United States Department of Housing and Urban Development ("HUD") and Arbor Commercial Mortgage, LLC ("Arbor"). (Dkt. entry no. 1, Compl.) HUD removed the action to this Court pursuant to 28 U.S.C. § 1442(a)(1). (Id., Not. Rmv.) Thereafter, DeLuca voluntarily dismissed its claims against Arbor pursuant to Federal Rule of Civil Procedure ("Rule") 41(a)(1). (Dkt. entry no. 38, Stip. of Dismissal.) With respect to its remaining claims, DeLuca asserts, inter alia, that (1) HUD was unjustly enriched at DeLuca's direct expense, (2) it is a third-party beneficiary of a Building Loan Agreement that was assigned to HUD, and thus, it is entitled to final payment from HUD pursuant to the Building Loan Agreement, (3) it completed construction of a 160-unit assisted living facility in Freehold,

New Jersey, to HUD's satisfaction, and thus, the Court should impose an equitable lien in favor of DeLuca on certain retainage amounts and change order amounts that were set aside to compensate DeLuca for this project, (4) because it would be unconscionable to permit HUD to retain the retainage amounts and change order amounts set aside for DeLuca, the Court should impose a constructive trust on such amounts for DeLuca's benefit, and (5) HUD is estopped from asserting that DeLuca has an adequate remedy at law. (Dkt. entry no. 5, Am. Compl., at 10-15.)

DeLuca moves for summary judgment in its favor and against HUD pursuant to Rule 56. (Dkt. entry no. 33.) Further, HUD cross-moves for summary judgment in its favor and against DeLuca, in effect, pursuant to Rule 56. (Dkt. entry no. 37.) The Court held oral argument on the motion and cross motion on December 5, 2007. For the reasons stated herein, the Court will (1) grant DeLuca's motion, and (2) deny HUD's cross motion.

BACKGROUND

Millennium Assisted Living Residence at Freehold, LLC ("Millennium LLC") was organized for the sole purpose of developing, constructing, and operating a 160-unit assisted living facility at 93 Manalapan Avenue, Freehold, New Jersey ("Millennium Project"). (Dkt. entry no. 33-6, Joint Stip. of Facts, at ¶¶ 3-4.) To finance the project, Arbor provided

2

Millennium LLC with a $27,000,000 loan secured by a mortgage on the Millennium Project property. (Id., Ex. JT-45, Mortgage Note; id., Ex. JT-46, Mortgage & Ass. of Rent.)  HUD insured Arbor's mortgage loan to Millennium LLC and endorsed the mortgage note pursuant to 12 U.S.C. § 1715w, which is commonly referred to as Section 232 of the National Housing Act ("Section 232"). (See id., Ex JT-35, Commitment for Ins. Advances (stating that HUD "will endorse for insurance", pursuant to Section 232 of the National Housing Act, a mortgage note secured by a mortgage on the Millennium Project's property); id., Ex. JT-45, Mortgage Note; id., Ex. JT-46, Mortgage & Ass. of Rent, at attached Mortgagor's Cert.; id., Ex. JT-47, Mortgagee's Cert.)

DeLuca and HUD submitted a Joint Stipulation of Facts and Exhibits that provides extensive detail regarding, inter alia, (1) the information and documents included in Arbor and Millennium LLC's pre-application to HUD's Newark Program Center, which sought a firm mortgage insurance commitment with respect to the Millennium Project ("Pre-application"), (2) the filing, review, and processing of the Pre-application, (3) the guidelines used in processing the Pre-application, (4) the documents and information included in Arbor and Millennium LLC's firm commitment application to HUD's Newark Program Center, which sought a Firm Commitment of Insurance Advances from HUD with respect to the proposed $27,000,000 mortgage loan from Arbor to

3

Millennium LLC ("Firm Application"), (5) the screening, review, and general processing of the Firm Application, (6) all documents related to the February 26, 2001 closing of the mortgage loan transaction between Arbor and Millennium LLC, and HUD's endorsement of certain loan documents, and (7) HUD's "Initial Endorsement" of the mortgage loan from Arbor to Millennium LLC for insurance of advances.  (Id. at 3-22.)  The Court will incorporate these agreed upon facts by reference rather than recite them at length herein.

Millennium LLC and DeLuca, a general contractor, entered into a HUD Form-9242A(3-94) construction contract on February 26, 2001, pursuant to which DeLuca agreed to serve as the general contractor on the Millennium Project in exchange for payments not to exceed $20,895,520 ("Construction Contract").  (Id. at ¶ 70; id., Ex. JT-49, Constr. Contract.)  An amendment attached to the Construction Contract revealed that DeLuca had an "identity of interest" with Millennium LLC.  (See id., at Appendix 8; see also id., Ex. JT-8, 5-26-00 Redemption Agmt. & attached Amends. (granting DeLuca a 10% interest in the Millennium Project that would be fully redeemed upon completion of the project).)  Essentially, DeLuca agreed to waive all rights in and to a portion of his profits in the total amount of $1,602,000 in exchange for a promissory note in such amount made by Millennium LLC upon HUD's Initial Endorsement of the Millennium Project

4

mortgage.  (Id., Ex. JT-40, 2-15-01 Letter Agmt., at ¶ 1; see id., Ex. JT-8, 5-26-00 Redemption Agmt & attached Amends.) Accordingly, following HUD's Initial Endorsement of the mortgage loan, Millennium LLC executed a promissory note for the benefit of DeLuca in the original principal amount of $1,602,000.  (Id., Ex. JT-39, 2-26-01 Promissory Note.)  The promissory note states that interest at the rate of 7.5% per year will begin accruing on August 1, 2003, "and thereafter on the first day of January, until the entire indebtedness has been paid."  (Id.)  It further states that Millennium LLC may pay any amount or all of the principal "at any interest paying date" after HUD's "Final Endorsement" of the mortgage loan from Arbor to Millennium LLC. (Id.)[1]

On the same date that Millennium LLC entered into the Construction Contract with DeLuca, it also entered into a Building Loan Agreement with Arbor.  (Dkt. entry no. 33-6, Joint Stip. of Facts, at ¶ 71; id., Ex. JT-48, Bldg. Loan Agmt.)  The Building Loan Agreement required Millennium LLC to, inter alia, complete the Millennium Project by July 26, 2002, make monthly

---

[1] James DeLuca, the President and principal owner of DeLuca, asserts that Millennium LLC and Arbor told him that the promissory note was meaningless and ineffective.  (Dkt. entry no. 33-20, DeLuca Aff., at ¶ 17.)  James DeLuca further asserts that pre-closing he acknowledged that the promissory note was meaningless and that DeLuca would only be compensated for actual construction costs plus "the periodic payment of amounts for the 'redemption' of the temporary, non-principal, minority 'identity of interest'."  (Id. at ¶ 18.)

applications for advances of mortgage proceeds on a specific HUD form, and pay laborers and mechanics in accordance with the provisions of Section 212(a) of the National Housing Act.  (Id., Ex. JT-49, Bldg. Loan Agmt., at ¶¶ 2, 4(a), 14(a).)  Moreover, it stated that Arbor would make a building loan to Millennium LLC in the principal amount of $27,000,000 secured by a mortgage on the Millennium Project property, with interest accruing from the date of each advance at the rate of 7.5% per year.  (Id. at ¶ 1.)

> Pursuant to the Building Loan Agreement, the Construction Contract and HUD Guidelines . . ., DeLuca was required to make all requests for monthly payments on Form HUD - 92448 which requires that ten percent (10%) of the value of HUD-approved construction costs (approved by HUD and owing to DeLuca) be retained by Arbor to assure completion of the construction of the [Millennium] Project [("holdback amounts" or "holdback monies")].

(Id. at ¶ 71.)

DeLuca commenced construction on the Millennium Project on March 7, 2001.  (Id. at ¶ 72.)  The project experienced delays due to soil compaction problems and contaminated ground water.  (Id. at ¶¶ 74-76.)  Thus, HUD approved and processed five separate construction change orders to the Construction Contract, which resulted in increased construction costs.  (Id. at ¶ 78 and corresponding Exhibits.)  Nevertheless, the Millennium Project was ultimately completed in October 2002.  (Id. at ¶ 83; Ex. JT-61, 10-8-02 Cert. of Substantial Completion & 10-31-02 Cert. of Substantial Completion.)  Shortly after completion, Millennium

6

fully redeemed DeLuca's "identity of interest" in the project. (Dkt. entry no. 33-20, DeLuca Aff., at ¶ 20; HUD Br., at 14.) Thereafter, the project experienced financial difficulties because Millennium LLC was unable to lease a sufficient number of assisted living residences.  (Id. at ¶ 82.)

DeLuca submitted a HUD Form 92330-A Contractor's Certificate of Actual Cost prepared by independent auditors, which certifies that the total construction cost of the Millennium Project, including the costs associated with the change orders, was $21,112,602.  (Id. at ¶ 92; id., Ex. JT-68, 10-31-02 Cert. of Actual Cost.; see id. at ¶ 98 (noting HUD received the final version of DeLuca's HUD Form 92330-A on November 21, 2003).) However, "HUD Construction Analyst/Architect Curtis Rumph concluded that the total amount of DeLuca construction costs which HUD would allow to be paid with HUD insured mortgage proceeds was $20,826,145."  (Id. at ¶ 94.)  Thereafter, a HUD project manager prepared a HUD Form-92330 Cost Certification Review Worksheet and determined that the "allowable construction costs which would be allowed by HUD for work performed by DeLuca was a 'Contractual Amount' of $20,581,978 . . ., plus a 'Bond Premium' paid by DeLuca of $145,000 . . ., plus 'Contractor's Other Fees' due DeLuca of $100,240 . . ., for a total HUD allowed actual cost for work performed by DeLuca of $20,827,218."  (Id. at ¶ 100; id., Ex. JT-73, 12-9-03 Cost Cert. Rev. Worksheet.)

Arbor declared Millennium LLC in default of the Mortgage Note on June 16, 2003.  (Id. at ¶ 96; id., Ex. JT-70, 6-16-03 Arbor Default Letter.)[2]  Accordingly, Arbor asserted a mortgage insurance claim against HUD in the amount of $24,768,971.17. (Id. at ¶ 103; id., Ex. JT-84, 10-18-04 Braun Letter.)   Arbor then assigned all of its mortgage loan documents for the Millennium Project, including the mortgage and mortgage note, to HUD on June 14, 2004.  (Id. at ¶¶ 104-114.)  The total amount of the mortgage loan proceeds that were not disbursed to Millennium LLC due to its default was $1,854,625.88.  (Id. at ¶ 116.)  Thus, in theory, this balance was transferred to HUD upon assignment of the corresponding mortgage loan documents.

After examining Arbor's claim against it for mortgage insurance benefits resulting from Millennium LLC's default, HUD "settled" the claim for $24,768,870.02.  (Id. at ¶ 117; id., Ex. JT-84, 10-18-04 Braun Letter.)  However, HUD's Mortgage Credit Handbook specifies that if an "identity of interest" exists between the mortgagor and the general contractor, the contractor's holdback monies cannot be released until Final Endorsement of the mortgage loan by HUD.  (HUD Br., at 21.) Because Millennium LLC defaulted before the Millennium Project mortgage reached Final Endorsement, there could be no further

---

[2] Millennium LLC filed a voluntary petition under chapter 11 of the United States Bankruptcy Code on June 7, 2004.  (Id. at ¶ 102.)

advances of the mortgage proceeds, and thus, DeLuca was not paid
the remaining outstanding balance of its construction costs for
the Millennium Project.  (See id. at 5, 22.)  DeLuca's
outstanding construction costs consist of (1) the holdback
amounts that were required by HUD Form 02448, which the Building
Loan Agreement, Construction Contract, and HUD Guidelines
mandated that DeLuca use to make its monthly payment requests,
and (2) costs accrued in connection with construction change
orders that were necessary but not approved.  (See dkt. entry no.
33-20 DeLuca Aff., at ¶ 22; HUD Br., at 5; see also dkt. entry
no. 33-6, Joint Stip. of Facts, at ¶ 71.)  Therefore, DeLuca
seeks payment of the following amounts from the undisbursed
mortgage proceeds that were assigned to HUD: (1) $1,354,310,
which represents the $20,827,218 of construction costs that were
previously approved by HUD less the $19,472,908 it has already
been paid with respect to the Millennium Project, (2) $200,000
for costs incurred as a result of change orders that were deemed
"Necessary but not approved" by HUD, and (3) applicable costs and
interest.  (Dkt. entry no. 33-20, DeLuca Aff., at ¶¶ 25-26; HUD
Br., at 15 (stating that "upon information and belief, the
numbers are approximately as stated by Mr. DeLuca.").)

**DISCUSSION**

I.  **Legal Standards**

A.  **Summary Judgment Standard**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The movant bears the initial burden of showing that there is no genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant has met this prima facie burden, the non-movant must "set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e)(2).  A non-movant must present actual evidence that raises a genuine issue of material fact and may not rely on mere allegations.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The Court must view the evidence in the light most favorable to the non-movant when deciding a summary judgment motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  At the summary judgment stage, the Court's role is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  Under this standard, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient [to defeat a Rule

10

56(c) motion]; there must be evidence on which the jury could reasonably find for the [non-movant]." Id. at 252. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48 (emphasis in original). A fact is material only if it might affect the action's outcome under governing law. Id. at 248. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted).

### B.   Unjust Enrichment

To establish an unjust enrichment claim, the plaintiff must show that (1) the "defendant received a benefit and . . . retention of the benefit without payment would be unjust", and (2) the plaintiff "expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." Royale Luau Resort, LLC v. Kennedy Funding, Inc., No. 07-1342, 2008 U.S. Dist. LEXIS 11902, at *30 (D.N.J. Feb. 19, 2008) (quoting VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994)); Iliadis v. Wal-Mart Stores, Inc., 922 A.2d 710,

723 (N.J. 2007) (same); see Castro v. NYT Television, 851 A.2d 88, 98 (N.J. App. Div. 2004).  Liability may be imposed if facts were concealed from the plaintiff, but the plaintiff would have expected remuneration from the defendant at the time the benefit was conferred had the plaintiff known the true facts.  Castro, 851 A.2d at 98.  Thus, a plaintiff may recover under an unjust enrichment cause of action if there was some direct relationship between the plaintiff and defendant that created a reasonable expectation of benefit, and the plaintiff expected remuneration. See id. at 98-99 (discussing prior holding).  However, a plaintiff cannot pursue a quasi-contractual claim for unjust enrichment if there is an express contract covering the subject matter of the claim.  Royale Luau Resort, LLC, 2008 U.S. Dist. LEXIS 11902, at *30.

C.   **Section 232**

Section 232 was enacted to "assist in the provision of facilities" for certain enumerated purposes, including the "development of assisted living facilities for the care of frail elderly persons."  12 U.S.C. § 1715w(a)(3).  It authorizes HUD to insure any mortgage that covers a new or rehabilitated assisted living facility and equipment to be used in such facility's operations, subject to certain conditions.  12 U.S.C. § 1715w(d). These conditions include, inter alia, that (1) the mortgage must be executed by a HUD-approved mortgagor, and (2) the principal

amount of the mortgage must not exceed 90% of the estimated value of the property or project.  12 U.S.C. § 1715w(d)(1)-(2).  Thus, Section 232 encourages the development of assisted living facilities by permitting HUD to underwrite loans financing the construction of such facilities.

If a mortgagor defaults on a mortgage insured by HUD pursuant to Section 232 and such default continues for more than 30 days, the mortgagee then becomes eligible to receive insurance benefits from HUD.  See 24 C.F.R. § 207.255 (listing ways mortgagor may default on HUD-insured mortgage); 24 C.F.R. § 207.258(a).[3]  Within 45 days, the mortgagee must notify HUD if it intends to both file an insurance claim for the losses it incurred as a result of the default and assign the mortgage to HUD.  24 C.F.R. § 207.258(a).  If the mortgagee elects to assign the mortgage to HUD, within 45 days of such assignment, it must deliver to the Federal Housing Commissioner (1) "an assignment of all claims of the mortgagee against the mortgagor or others arising out of the mortgage transaction", (2) all title policies, insurance, bonds, or other guarantees and documents evidencing that title was conveyed to the Federal Housing Commissioner, (3) all documents relating to the mortgage transaction, (4) mortgagor

---

[3] The provisions relating to mortgages insured under section 207 of the National Housing Act, 24 C.F.R. § 207.1 et seq., also apply to mortgages insured under Section 232, except 24 C.F.R. § 207.258b.  24 C.F.R. § 232.251.

property held by the mortgagee, and (5) any additional information the Federal Housing Commissioner requires.  24 C.F.R. § 207.258(b)(4).  Further, the Federal Housing Commissioner may direct the mortgagee to turn over the outstanding balance of the mortgage loan that was not advanced to the mortgagor.  24 C.F.R. § 207.258(b)(5)(i).  Following completion of the mortgage assignment, HUD must pay the mortgagee's insurance claim in cash, debentures, or a combination of both.  24 C.F.R. § 207.259(a). Accordingly, when a mortgagor defaults on a mortgage insured under Section 232, HUD must ultimately satisfy the outstanding amount the mortgagor owes to the mortgagee, less certain charges. See 24 C.F.R. § 207.259.  However, neither Section 232 nor its corresponding regulations address HUD's obligations to the project contractor following such a default and assignment of the mortgage loan to HUD.

The parties have not provided, and the Court's own research has not uncovered, any cases involving a contractor's claim to recover retainage or holdback amounts from HUD following a mortgagor's default on a mortgage loan insured under Section 232. There are, however, cases involving a contractor asserting claims against HUD for holdback or retainage amounts arising out of projects under (1) 12 U.S.C. § 1715z-1, which is commonly referred to as Section 236 of the National Housing Act ("Section 236"), (2) 12 U.S.C. § 1715(d)(4), which is commonly referred to as Section 221(d)(4) of the National Housing Act, and (3) 12

14

U.S.C. §§ 1749aaa et seq., which facilitates financing for group medical practice facilities.  Although arising from different types of projects, the structure of the mortgage transactions, the construction contracts, and the processes by which HUD was assigned the mortgages in each of these cases is substantially similar to the facts of this case.  Thus, they provide the Court with significant guidance.  In fact, we believe that the distinctions between a low income housing project, as discussed below, and other types of HUD insured projects, such as the one at issue in this action, are of little significance to our ultimate analysis, and thus, the same general principles should be applied.

In Trans-Bay Engineers & Builders, Inc. v. Hills, the United States Court of Appeals for the District of Columbia addressed whether a general contractor was entitled to recover from HUD costs it incurred during construction of a Section 236 low-income housing project, which were "heldback" from each of the contractor's payment requests.  551 F.2d 370, 373 (D.C. Cir. 1976).  Section 236 was enacted to make rental housing available to low income families.  Id.  Similar to Section 232, HUD provides mortgage insurance for Section 236 projects.  See id. If a non-profit corporation sponsors or owns a Section 236 project, "HUD will insure a mortgage covering 100 percent of the replacement cost of the project."  Id.  In Trans-Bay, the owner

15

of the Section 236 low-income housing project, More Oakland
Residential Housing, Inc. ("MORH"), received mortgage financing
for the project from Advance Mortgage Corporation ("Advance").
Id. at 373-74.  Because MORH was a non-profit corporation, HUD
insured 100% of the project's mortgage.  See id. at 373.

MORH entered into a contract with Trans-Bay Engineers &
Builders, Inc. ("Trans-Bay"), pursuant to which Trans-Bay agreed
to perform the general contracting work on the project.  Id.  The
construction contract entitled Trans-Bay to receive incremental
payments from MORH based on completed construction, less a 10%
holdback.  Id. at 373.  The construction contract stated that the
total holdback amount "shall be payable" to Trans-Bay 30 days
after construction was completed provided certain conditions were
met.  Id. at 375.  The project was completed and all required
conditions were met within the 30-day period.  Id. at 374-75.
Accordingly, HUD released half of the total holdback amount to
Trans-Bay, but argued that the remaining funds could not be
disbursed until after a "final closing" of the project's mortgage
financing.  Id. at 375.  Because MORH defaulted on its mortgage
loan from Advance, a final closing did not occur.  Id.  Instead,
Advance assigned the mortgage to HUD, which then foreclosed the
mortgage.  Id.

Trans-Bay commenced an action against both Advance and HUD.
Id.  The district court entered summary judgment in favor of HUD

16

and Advance.  Id. at 373.  On appeal, the circuit court noted
that the district court had correctly concluded that Trans-Bay
could bring an action as a third-party beneficiary of the
building loan agreement between Advance and MORH.  Id. at 378.
The court then noted that the building loan agreement did not
state that a final closing was a prerequisite to payment of the
holdback monies, and any statement to the contrary in a HUD
handbook had no enforceable status.  Id. at 378-79.  The court
explained that the unambiguous language of the construction
contract between MORH and Trans-Bay required payment of the
holdback monies within 30 days of specific events, and the
building loan agreement did not alter this requirement or
condition it upon a final closing.  Id. at 379.  Therefore, the
court stated:

> where HUD has certified completion of construction, we
> cannot find in any fair reconstruction of intent and
> reliance a basis for ruling that the absence of a final
> closing was a complete bar to recovery of the holdback
> amounts.  This result seems especially appropriate
> where, as here, all the contracts and forms were
> drafted by HUD, and the canon that documents be
> construed against the draftsmen is reinforced by the
> reality that HUD was engaged in a program of inducing
> private construction for the public benefit, and had
> effective control over all agreements and documents.

Id.

The record before the court, however, was unclear as to
whether MORH defaulted on the mortgage before Trans-Bay's right
to the holdback monies vested.  Id. at 379-80 (explaining that

17

the building loan agreement stated that Advance could only continue to advance funds to MORH if it was not in default, and thus, Trans-Bay could not claim entitlement to further payments once MORH defaulted).  Nevertheless, the court held that Trans-Bay was also entitled to an equitable lien on the holdback amount.  Id. at 383.  In reaching this holding, the court emphasized that (1) HUD "was the guiding spirit behind the entire project", (2) HUD's overreaching and control with respect to the project "established its own responsibility for equitable conduct", (3) MORH was not a private commercial venture, but instead, was a non-profit, no asset corporation created to carry out a government inspired purpose, (4) Trans-Bay reasonably expected that HUD would "make good" on any amounts owed to it under the construction contract, and (5) the undisbursed mortgage proceeds constituted an identifiable res upon which an equitable lien could be placed.  Id. at 381-82.  Thus, the Court found that Trans-Bay was likely entitled to the holdback monies plus interest from the date its right to such monies vested.  Id. However, the court remanded the case to the district court for a determination of whether Trans-Bay had unclean hands, and thus, equity should be stayed.  Id.

Other courts have followed Trans-Bay and permitted a contractor on a HUD-insured project to (1) commence an action seeking payment for outstanding construction costs as a third-

party beneficiary of the building loan agreement between the
project sponsor and the commercial lender, (2) recover amounts
"heldback" during the construction contract period by imposing an
equitable lien on the undisbursed mortgage loan proceeds even
after the mortgage loan and corresponding documents are assigned
or otherwise transferred to HUD following a default, or (3) do
both.  See Spring Constr. Co., Inc. v. Harris, 562 F.2d 933 (4th
Cir. 1977); S.S. Silberblatt, Inc. v. E. Harlem Pilot Block -
Bldg. 1 Hous. Dev. Fund Co., 608 F.2d 28 (2d Cir. 1979); Bennett
Constr. Co. v. Allen Gardens, Inc., 433 F.Supp. 825 (W.D. Miss.
1977); U.S. v. Mill Ass'n, Inc., 480 F.Supp. 3 (E.D.N.Y, 1978);
see also F.W. Eversley & Co., Inc. v. Brownsville Hous. Dev. Fund
Corp., 409 F.Supp. 791, 799 (S.D.N.Y. 1976) (decided before
Trans-Bay but imposing an equitable lien in favor of a project
contractor on escrow funds and retainages held by HUD and owing
to the contractor); Travelers Indem. Co. v. First Nat'l State
Bank of N.J., 328 F.Supp. 208, 216 (D.N.J. 1971) (decided before
Trans-Bay but holding that the contractor's surety and co-
trustees in bankruptcy, as creditor third-party beneficiaries of
the building loan agreement, could recover retainages and escrow
amounts owing to the contractor from HUD after the mortgage was
assigned to HUD).  Such courts have reached their holdings in
order to prevent HUD from being unjustly enriched by retaining
the value of the contractor's services, and in many instances

receiving a completed project, without fully compensating the contractor for its work. See Spring Constr. Co., Inc., 562 F.2d at 937-38; S.S. Silberblatt, Inc., 608 F.2d at 37 (noting that HUD was enriched by the contractor's goods and services because it acquired an equitable interest in the project when the mortgage was assigned to it and was able to carry out the Congressional directive of making low-cost housing available); F.W. Eversley & Co., Inc., 409 F.Supp. at 795; Bennett Constr. Co. v. Allen Gardens, Inc., 433 F.Supp. at 836; Mill Ass'n, Inc., 480 F.Supp. at 7, 12.

Other courts, however, have concluded that HUD, as mortgage insurer under the National Housing Act, does not guarantee a profit to a project's general contractor and assumes no obligations to any party involved in the mortgage transaction except the mortgagee. See, e.g., Marcus Garvey Square, Inc. v. Winston Burnett Constr. Co. of Cal., Inc., 595 F.2d 1126, 1130 (9th Cir. 1979). Thus, certain courts have rejected a contractor's attempt to recover from HUD for work performed on a HUD-insured project. See id. (rejecting plaintiff contractor's attempt to assert a statutory claim against HUD under any provision of the National Housing Act); Taylor Woodrow Blitman Constr. Corp. v. Southfield Gardens Co., 534 F.Supp. 340, 343-44, 347-49 (D. Mass. 1982) (finding that the plaintiff contractor (1) was not a third-party beneficiary of the building loan agreement

because such agreement was not made for his benefit, and (2) could not recover from HUD under an unjust enrichment theory because he had an adequate remedy at law and could recover from the credit-worthy project owner); see also Aetna Cas. & Sur. Co. v. U.S., 655 F.2d 1047, 1054-56 (Ct. Cl. 1981) (determining that the court did not have jurisdiction over the plaintiffs' third-party beneficiary claim against HUD because no provision of the National Housing Act suggested that HUD was bound to disburse unpaid mortgage proceeds following an assignment from a mortgagee).

The Marcus Garvey court relied on the fact that no specific fund of undisbursed mortgage loan proceeds existed for imposition of an equitable lien.  Here, the undisbursed mortgage proceeds were transferred to HUD, and thus, in our view there is a fund available that may be subject to an equitable lien.  Further, we disagree with those courts that have either concluded that a contractor cannot assert a claim as a third-party beneficiary of a building loan agreement, or refused to impose an equitable lien on undisbursed mortgage proceeds assigned to HUD to prevent unjust enrichment.  Instead, we will follow the reasoning of Trans-Bay and its progeny, and apply their principles to the present facts.

## II.  Legal Standards Applied Here

DeLuca argues that HUD exercises broad powers and sweeping control over almost every aspect of a project administered pursuant to Section 232.  (DeLuca Br., at 16.)  DeLuca further argues that HUD exercised unprecedented control and took unacceptable risks with respect to the Millennium Project.  (Id. at 21.)  Specifically, DeLuca asserts, inter alia, that HUD (1) ignored, waived, misapplied, or overrode its own protocol and safeguards in processing and underwriting the Millennium Project, (2) "keenly aligned" its interests and actions with the interests and action of Millennium LLC "all without any regard to their future adverse financial impacts on DeLuca", (3) used an "identity of interest" device to reduce the amount of equity the Millennium Project needed to qualify for HUD mortgage insurance, (4) ignored both its lead economist's determination that the Millennium Project was a very high risk and its lead mortgage credit examiner's determination that it was an "unacceptable insurance risk" when its director overrode their recommendations to reject the project, (5) overstated the appraised value of Millennium LLC's real property, (6) waived certain of its Handbook provisions with respect to the Millennium Project, (7) approved 150 days worth of construction extensions without charging Millennium LLC for the costs associated with such extensions, and (8) allowed Millennium LLC to avoid default by

22

"raiding" its mandatory 24-month Initial Operating Deficit Escrow to pay loan interest and other costs. (<u>Id.</u> at 21-29.)

DeLuca asserts that, in light of the facts establishing HUD's control and overreaching with respect to the Millennium Project, the Court has the power to impose an equitable remedy against HUD to prevent it from being unjustly enriched.  (<u>Id.</u> at 29-30.)  DeLuca emphasizes that Millennium LLC "was no more than a 'HUD alter ego' or mere 'creature of HUD', which was created, supported and fully financed by HUD for the exclusive purpose of the completion of the Millennium Assisted Living Residence by plaintiff DeLuca." (<u>Id.</u> at 37.)  DeLuca also emphasizes that HUD received what it desired from the Millennium Project, a completed assisted living facility. (<u>Id.</u> at 38.)  Thus, DeLuca contends that the Court should direct HUD to reimburse it for its outstanding construction costs on the Millennium Project by either imposing an equitable lien or giving it third-party beneficiary status.  (<u>See id.</u> at 30-38, 44.)

HUD, in contrast, argues that its only role in the Millennium Project was insurer for the lender that financed the project. (HUD Br., at 18.)   HUD notes, <u>inter alia</u>, that (1) under its mortgage insurance programs, it does not loan money, and is not a party to either the construction contract between the mortgagor and general contractor or the building loan agreement between the lender and the mortgagor, (2) DeLuca was

23

not in privity of contract with Arbor or HUD, (3) "DeLuca chose
to allow a profit of $1.6 million to be treated as an allowance
not to be paid in cash, in order to enable the mortgagor to meet
the equity requirements for closing" and such decision was not
mandated by HUD, and (4) DeLuca was not paid the final amounts it
was owed because Millennium LLC defaulted, and thus, HUD could
not proceed to Final Endorsement and insure any further advances
of loan proceeds.  (Id. at 19-22.)  Moreover, HUD emphasizes that
between it and DeLuca were both Millennium LLC, a for-profit
entity, and Arbor, a commercial lender.  (Id. at 22-23.)  Thus,
HUD asserts that it was not the "driving force" behind the
Millennium Project, but instead, simply enabled Millennium LLC to
proceed with the project.  (Id. at 23, 29-31.)

    HUD acknowledges that the Court may impose equitable
remedies under certain circumstances.  (Id. at 32.)  However, it
asserts that under the facts here, there is no basis for either
imposing an equitable lien on the undisbursed loan proceeds or
finding that DeLuca was a third-party beneficiary of the Building
Loan Agreement between Arbor and Millennium LLC.  (Id. at 32-36.)
Specifically, HUD states that the facts do not suggest that it
promoted or developed the Millennium Project, DeLuca did any due
diligence with respect to the financial viability of the
Millennium Project, or anyone at HUD made any representations to
DeLuca regarding the Millennium Project.  (Id.)  HUD also states

24

that DeLuca was not a third-party beneficiary of the mortgage or
the Business Loan Agreement between Arbor and Millennium LLC
because there was no intent to benefit DeLuca in those
agreements.  (Id. at 37-39.)   Thus, HUD contends that the Court
should grant summary judgment in its favor on the entire
complaint.  (Id. at 43.)

DeLuca cannot pursue a contract claim against HUD based on
the Construction Contract because HUD was not a party to that
contract.  Nevertheless, equitable principles permit us to hold
HUD liable to a party with whom it has not specifically
contracted.  See F.W. Eversley & Co., Inc., 409 F.Supp. at 798
("We do not find it inequitable to hold the government . . .
liable to a party with whom [it] has not specifically
contracted.").  HUD assumed the obligations of Arbor upon
assignment of the Millennium Project mortgage, and thus, stepped
into the shoes of Arbor as a party to the Building Loan
Agreement.  See 24 C.F.R. § 207.258.  This Court is in accord
with those courts that have found that a contractor may assert
claims as a third-party beneficiary of a building loan agreement
between the mortgagor and mortgagee of a HUD-insured project.
See Trans-Bay Eng'rs, Inc., 551 F.2d at 378; Bennett Constr. Co.,
433 F.Supp. at 833; Mill Ass'n, Inc., 480 F.Supp. at 7; see also
Travelers Indem. Co., 328 F.Supp. at 215-16.  The Building Loan
Agreement does not require that Final Endorsement of the mortgage

25

loan must occur before the holdback monies may be disbursed to DeLuca.  See Trans-Bay Eng'rs, Inc., 551 F.2d at 378-79.  Any such requirement in HUD's Mortgage Credit Handbook has no enforceable status.  See id.  Accordingly, DeLuca, as a third-party beneficiary of the Building Loan Agreement, is entitled to recover the holdback monies it earned but has not yet received from HUD, the assignee of the undisbursed mortgage proceeds.  The Court notes that DeLuca completed the Millennium Project in October 2002, and Millennium LLC did not default on the mortgage note until June 16, 2003.  (Dkt. entry no. 33-6, Joint Stip. of Facts, at ¶¶ 83, 96.)  Thus, DeLuca's right to receive the holdback monies vested prior to Millennium LLC's default.  See Trans-Bay Eng'rs, Inc., 551 F.2d at 379-80 (noting that the plaintiff contractor could not claim entitlement to further payment once the project owner had defaulted on its mortgage obligations).

Even if DeLuca were not entitled to recover the holdback monies under a third-party beneficiary theory, the circumstances presented here enable the Court to impose an equitable lien on the undisbursed loan proceeds for the benefit of DeLuca.  The undisbursed loan proceeds constitute an identifiable res upon which an equitable lien may be placed even if such proceeds are commingled with other HUD accounts.  See id. at 382; Bennett Constr. Co., 433 F.Supp. at 835.  When DeLuca completed the

26

Millennium Project, it was entitled to payment of the holdback monies from such identifiable res.  Although HUD's guidelines required Final Endorsement of the Millennium Project before the holdback amounts could be paid to DeLuca, equitable considerations suggest that such amounts should still be paid to DeLuca even though no Final Endorsement occurred.

HUD was more than just a mortgage insurer with respect to the Millennium Project.  HUD was a key participant in the project that, inter alia, (1) permitted Millennium LLC to give DeLuca an "identity of interest" in the Millennium Project to meet its capital requirements, (2) ignored and overrode the recommendation of its environmental appraiser to reject the Firm Application because Millennium LLC's property had ground water contamination, (3) ignored and overrode the recommendation of one of its mortgage credit examiners to reject the Millennium Project because the "scope of project exceeds experience and credit history of ownership", (4) required Millennium LLC to issue a HUD Form 9223 promissory note in the amount of $1,602,000 to DeLuca for its withheld profits, (5) endorsed the mortgage note, provided and signed the Mortgagee's Certificate, and provided the form for the Construction Contract, (6) required DeLuca to make all monthly payment requests on HUD Form 92448, which required that Arbor retain 10% of DeLuca's HUD-approved construction costs to assure project completion, (7) approved and processed five

27

separate construction change orders to the Construction Contract, and (8) prepared a HUD Form 92330 Cost Certification Review Worksheet and determined that the total "allowable construction costs which would be allowed by HUD for work performed by DeLuca" was $20,827,218. (Dkt. entry no. 33-6, Joint Stip. of Facts, at ¶¶ 20-22, 50, 56-59, 65, 69, 71, 78, 100; <u>id.</u>, Ex. JT-7, 2-2-00 Letter Agmt. between a HUD Director & Attny. for Millennium LLC; <u>id.</u>, Ex. JT-25, HUD Environ. Ass.; <u>id.</u> Ex. JT-27, 11-13-00 Kreher Letter (overriding HUD environmental appraiser's recommended rejection of the Millennium Project because, among other reasons, the NJDEP thought the project was environmentally safe); <u>id.</u>, JT-32, "Supplement to Project Analysis" for the Millennium Project; <u>id.</u>, Ex. JT-34, 12-7-00 Kreher Email (stating that although mortgage credit recommends rejection of the Millennium Project, he is overriding that decision and approving the project based on a face to face meeting with the project owners and mortgagee); <u>id.</u> JT-39, 2-26-01 Promissory Note; <u>id.</u>, Ex. JT-73, 12-9-03 Cost Cert. Rev. Worksheet.)  Thus, the Court finds that HUD "was the guiding spirit behind the entire project."  See <u>Trans-Bay Eng'rs, Inc.</u>, 551 F.2d at 381.

HUD was highly involved in the development of the Millennium Project through its appraisals, evaluations, meeting with the Millennium LLC owners, and the forms it provided to Millennium LLC for use at all stages of the project.  Moreover, HUD was

aware from the project's inception that Millennium LLC was a single-asset entity organized for the exclusive purpose of completing the Millennium Project.  (See dkt. entry no. 33-6, Joint Stip. of Facts, at ¶ 4; id. JT-10, Firm Commitment Narrative, at 12.)  Nevertheless, HUD ignored its own environmental appraiser and mortgage credit examiner, both of whom recommended rejecting the project due to ground water contamination at the project site and the inexperience of the project owner.  The Court sees little difference between HUD's decision here to proceed with a Section 232 project owned and sponsored by an inexperienced company whose only asset was the underlying project, and those cases involving a Section 236 project owned and sponsored by a non-profit asset-less organization.  See, e.g., S.S. Silberblatt, Inc., 608 F.2d at 32-33.  Thus, we find that Millennium LLC was a "creature of HUD", which permitted the project to go forward despite recommendations to the contrary and its knowledge of Millennium LLC's financial status.  See F.W. Eversley & Co., 400 F.Supp. at 797.

As a result of DeLuca's construction services, HUD received a benefit: a completed assisted living facility that furthers the Congressional goal of relieving housing shortages for the frail elderly.  Allowing HUD to retain such benefit without fully compensating DeLuca would be unjust.  See Royale Luau Resort, LLC, 2008 U.S. Dist. LEXIS 11902, at *30.  As shown by the

Construction Contract, DeLuca expected remuneration, the full contract amount plus change order amounts, when it constructed and completed the Millennium Project.  Although the Construction Contract was between DeLuca and Millennium LLC, it was reasonable for DeLuca to expect remuneration from HUD in the event Millennium LLC could not complete the payments because (1) the Construction Contract was a HUD form (HUD Form-9242A(3-94)), (2) the Millennium LLC promissory note required HUD's Final Endorsement before DeLuca could be paid the principal amount of such note, (3) DeLuca was required to make all requests for monthly payments on HUD Form 92448, (4) HUD approved and processed five separate construction change orders, and (5) following completion of the project, DeLuca submitted its list of actual costs on a HUD Form 923330-A Contractor's Certificate of Actual Cost.  (Dkt. entry no. 33-6, Joint Stip. of Facts, at ¶ 70-71, 78, 92; id., Ex. JT-49, Constr. Contract; id., Ex. JT-39, 2-26-01 Promissory Note; id., Ex. JT-68, 10-31-02 Cert. of Actual Cost.)  See Royale Luau Resort, LLC, 2008 U.S. Dist. LEXIS 11902, at *30.  Thus, because there was an indirect relationship between DeLuca and HUD, which created a reasonable expectation that HUD would receive a benefit in exchange for remuneration, the Court finds that HUD would be unjustly enriched if it were not required to compensate DeLuca for its performance.  See Castro, 851 A.2d at 98-99.

We therefore conclude that DeLuca, which fully performed its obligations with respect to the Millennium Project, is entitled to recover from HUD the outstanding balance of the costs it incurred in completing the project, which includes both the holdback monies and the amounts incurred in connection with the necessary but unapproved change orders.  An equitable lien in favor of DeLuca attaches to the undisbursed mortgage proceeds in the amount of the outstanding balance owed to DeLuca.[4]

### CONCLUSION

The Court, for the reasons stated <u>supra</u>, will (1) grant DeLuca's motion for summary judgment, and (2) deny HUD's cross motion for summary judgment.  The Court will issue an appropriate order and judgment.


                                    s/ Mary L. Cooper
                              **MARY L. COOPER**
                              United States District Judge

Dated: <u>March 14, 2008</u>

---

[4] It appears that the parties agree that the outstanding amount DeLuca is owed with respect to construction costs previously approved by HUD is $1,354,310, and that this amount constitutes holdback monies.  (Dkt. entry no. 33-20, DeLuca Aff., at ¶ 25; HUD Br., at 15 (stating that "upon information and belief, the numbers are approximately as stated by Mr. DeLuca").)  It also appears that the parties agree that the construction costs DeLuca accumulated with respect to the "Necessary but not approved" change orders was $200,000.  (<u>See</u> dkt. entry no. 33-20, DeLuca Aff., at ¶ 26; HUD Br., at 15.)  Thus, based on these numbers the total award to DeLuca would be $1,554,310 plus applicable interest.